## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

NICOLETTE ASCIUTTO, as Next
Friend for JOHN ASCIUTTO
and ANTHONY ASCIUTTO II, minors;
and JOHN VACKARO as Next Friend
for MARCO VACKARO, a minor,

     Plaintiffs,                      Case No. 2022-cv-_____

v.                                    Hon. _____

OXFORD COMMUNITY SCHOOL
DISTRICT; SUPERINTENDENT TIMOTHY
THRONE; PRINCIPAL STEVEN WOLF;
DEAN OF STUDENTS NICHOLAS EJAK;
COUNSELOR PAM PARKER FINE;
COUNSELOR SHAWN HOPKINS;
TEACHER #1; TEACHER #2, and
TEACHER #3, in their individual capacities,

     Defendants.
_____/

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiffs NICOLETTE ASCIUTTO, as Next Friend for JOHN ASCIUTTO

and ANTHONY ASCIUTTO II, minors; and JOHN VACKARO, as Next Friend for

MARCO VACKARO, a minor, by and through their attorneys, Giroux Trial

Attorneys, P.C., state the following for their Complaint against the above-named

Defendants:

## INTRODUCTION

1.      This action arises out of the mass school shooting committed by Ethan Crumbley ("EC") on November 30, 2021 at Oxford High School ("OHS").

2.      By way of their actions and conduct, Superintendent Timothy Throne, Principal Steven Wolf, Dean of Students Nicholas Ejak, Counselor Pam Parker Fine, Counselor Shawn Hopkins, TEACHER #1, TEACHER #2, and TEACHER #3 ("the individual government Defendants") made the OHS students less safe, causing them to be subject to harm, and their conduct was reckless, deliberately indifferent and demonstrating a substantial lack of concern for whether injury would result, and shocks the conscience.

3.       The policies, customs and practices of Defendant Oxford Community School District fostered the constitutional violations alleged herein and it further ratified the unconstitutional violations committed by the individual Defendants.

4.      The individual government Defendants, who were mandatory reporters under Michigan's Child Protection Act, MCL 722.621 *et seq.*, failed to report suspected neglect of EC, which failure in turn foreseeably and proximately resulted in and caused damages to Plaintiffs' Minors for which the individual government Defendants are civilly liable. MCL 722.633.

## JURISDICTION AND VENUE

5.      This Court has federal question jurisdiction of Plaintiff's claims pursuant to 28 U.S.C. §§ 1331, 1343 and 1983.

6.      Pursuant to the Court's supplemental jurisdiction under 28 U.S.C. § 1367, it may entertain the state law claims as they are derived from a common nucleus of operative facts.

7.      Venue lies in the Eastern District of Michigan pursuant to 28 U.S.C. §1391(b)(1)-(2). The Defendants all "reside" in the Southern Division of the Eastern District of Michigan.

## PARTIES

8.      At all relevant times, Plaintiff Nicolette Asciutto and her minor children, John Asciutto and Anthony Asciutto II, for whom she is acting as Next Friend in this litigation, were all citizen of the United States residing in the Township of Oxford, County of Oakland, State of Michigan.

9.      At all relevant times, Plaintiff John Vackaro and his minor child, Marco Vackaro, for whom he is acting as Next Friend in this litigation, were both citizens of the United States residing in the Township of Oxford, County of Oakland, State of Michigan.

10.      At all relevant times, Defendant Oxford Community School District was a municipal corporation organized and carrying out its functions in the

Township of Oxford, State of Michigan, with such functions non-exhaustively including staffing, training, and supervising OHS's staff, counselors and teachers.

11. On information and belief, at all relevant times, Defendant Timothy Throne was acting under color of state law within the course and scope of his employment as Superintendent of Defendant Oxford Community School District.

12. On information and belief, at all relevant times, Defendant Steven Wolf was acting under color of state law within the course and scope of his employment as a Principal for OHS within Defendant Oxford Community School District.

13. On information and belief, at all relevant times, Defendant Nicholas Ejak was acting under color of state law within the course and scope of his employment as a Dean of Students for OHS within Defendant Oxford Community School District.

14. On information and belief, at all relevant times, Defendant Pam Parker Fine was acting under color of state law within the course and scope of her employment as a counselor for OHS within Defendant Oxford Community School District.

15. On information and belief, at all relevant times, Defendant Shawn Hopkins was acting under color of state law within the course and scope of his employment as a counselor for OHS within Defendant Oxford Community School District.

16.     At all relevant times to this lawsuit, Defendant TEACHER # 1, whose name is unknown to the Plaintiffs as of the filing of this complaint, was acting as a classroom teacher at OHS, within the course and scope of her employment with OCS.

17.     TEACHER #1 had direct contact with EC on November 29, 2021, when EC violated multiple school policies, procedures and rules by searching on the internet for information about ammunition for his Sig Sauer handgun used in the fatal shootings of November 30, 2021.

18.     At all relevant times to this lawsuit, Defendant TEACHER #2, whose name is unknown to the Plaintiffs as of the filing of this complaint, was acting as a classroom teacher at OHS, within the course and scope of her employment with OCS.

19.     TEACHER #2 had direct contact with EC on November 30, 2021, when he caught EC violating multiple school policies, procedures, and rules by drawing pictures of his above referenced handgun, a bullet, a person shot twice in the chest with blood displayed and other highly concerning things while in class on a test review paper.

20.     TEACHER #2 had direct contact with EC on November 29, 2021, when EC violated multiple school policies, procedures and rules by searching on the

internet for information about ammunition for his Sig Sauer handgun used in the fatal shootings of November 30, 2021.

21.     TEACHER #3 had direct contact with EC on November 30, 2021, when he/she caught EC violating multiple school policies, procedures and rules by looking up violent videos on his phone.

## FACTUAL ALLEGATIONS

22.     Over the course of EC's freshman 2020-21 school year, through approximately June 2021, until such time as he became a sophomore and returned to Oxford OHS in September 2021, EC exhibited concerning behavior which should have alerted school employees and/or agents who had contact with him, that he was suffering from significant psychiatric problems, and that he might have been subject to neglect by his parents.

23.     Upon information and belief, in the weeks and then days leading up to the November 30, 2021 incident, EC acted in such a way that would lead a reasonable observer to know and/or believe that he was planning to cause great bodily harm to the students and/or staff at ohs.

24.     For example, before the November 30, 2021 incident, Ethan Crumbley posted countdowns and threats of bodily harm, including death, on his social media accounts, warning of violent conduct and murderous ideology.

25.     Approximately four weeks before the shooting, a severed deer head was brought into and left at the OHS, and the occurrence caused a level of concern and anxiety to students, teachers and school officials at OHS.

26.     Approximately two weeks before the shooting, on or about November 11, 2021, EC left a jar containing yellow fluid and a severed bird's head in one of the school bathrooms (where he subsequently commenced his mass shooting), and its discovery increased the level of concern and anxiety experienced by students, teachers and school officials at OHS.

27.     On November 11, 2021, students reported to school administration officials, including Defendant Wolf, the discovery of the jar in the boys' bathroom containing a severed bird head and yellow liquid.

28.     The following day, on November 12, 2021, the OHS administration sent an email to parents of its students indicating, "Please know that we have reviewed every concern shared with us and investigated all information provided . . . [w]e want our parents and students to know that there has been no threat to our building nor our students."

29.     Upon information and belief, on or about November 16, 2021, multiple parents of students provided communications to Defendant Wolf with concerns about threats to students made on social media, and the incident of the severed animal heads at Oxford High School, the two weeks before.

30.     Upon information and belief, the parents' communications to Wolf in part stated, "I know it's been investigated but my kid doesn't feel safe at school," "He didn't even want to go back to school today."

31.     Upon information and belief, that same day, November 16, 2021, Wolf emailed parents indicating, "I know I'm being redundant here, but there is absolutely no threat at the HS . . . large assumptions were made from a few social media posts, then the assumptions evolved into exaggerated rumors." It was clear from the messages that Wolf was hearing from parents and students that these were threats about which there were serious concerns.

32.     Upon information and belief, Defendants Throne and Wolf reviewed the social media posts of Crumbley prior to November 30, 2021, which threatened Oxford High School students.

33.     Defendants Throne and Wolf had actual knowledge of concerns about threats from parents and students at OHS.

34.     Defendants Throne and Wolf were aware that EC brought a severed bird head to school and left it in the boys' bathroom.

35.     Upon information and belief, Defendants Throne and Wolf had knowledge of EC's mental disturbance and dangerous ideations.

36.     Despite the posts and knowledge of threats of violence, Defendant Throne sent correspondence and emails to parents at OHS, reassuring them that their children were safe at OHS.

37.     Upon information and belief, following the November 16, 2021, email exchanges and other communications from Defendant Wolf to the parents of OHS students, Superintendent Throne warned the students, via loudspeaker, to stop spreading information over social media and to stop relying on information on social media, reiterating that there were no threats that posed any danger to students at OHS.

38.     At all relevant times, Defendant Throne, while acting as the Superintendent of Oxford Community School District, discouraged students and parents from reporting, sharing, or otherwise discussing the threatening social media posts.

39.     At all relevant times, Defendant Wolf, while acting as the Principal of OHS, directed the teachers and counselors to tell students to stop reporting, sharing, or otherwise discussing the threatening social media posts, and violent animal slaughter that was occurring at OHS.

40.     At all relevant times, EC's Instagram and other social media accounts were not set to private and were available to the public, including Defendants.

41.    At all relevant times, Defendants Throne and Wolf's respective actions, by advising each and every student, including Plaintiffs' Minors that there was no credible threat, demonstrated conduct so reckless as to demonstrate a substantial lack of concern for whether an injury results.

42.    At all relevant times, Plaintiffs' Minors were safer before Defendants Throne and Wolf respectively took action and advised each and every student, including Plaintiffs' Minors, that there was no credible threat. By virtue of Defendants Throne and Wolf's actions, they each substantially increased the harm to Plaintiffs' Minors.

43.    Defendant Throne knew and/or should have known, that his announcement to the students at OHS would discourage the students and/or their parents from reporting credible threats of bodily harm to teachers, counselors, and staff of OHS.

44.    Defendant Wolf's actions, by advising each and every student, including Plaintiffs' Minors, that there was no credible threat, constitutes conduct so reckless as to demonstrate a substantial lack of concern for whether an injury results.

45.    Defendant Wolf knew and/or should have known that his assurances that social media threats were not credible would discourage the students and/or their parents from reporting credible threats of bodily harm to teachers, counselors, and staff of OHS.

46.     On November 26, 2021, four days before the OHS shooting, Mr. Crumbley and EC went to a local gun dealer and purchased a Sig Saur 9mm semi-automatic handgun.

47.     Later that day EC posted a photo of himself with his new gun on social media, stating "just got *my* new beauty today."

48.     The next day, on or about November 27, 2021, three days before the OHS shooting, Mrs. Crumbley took EC to a local shooting range so that he could fire "his" new handgun, load it with ammunition, practice shooting it, as well as learn its other operations, including loading, reloading and firing.

49.     On that same day, EC's mother posted a picture on her publicly-visible and accessible social media account stating "mom and son day testing out *his* new Christmas present," clearly referring to the 9mm handgun.

50.     Upon information and belief, at the conclusion of the firearm practice, EC's handgun was readily accessible to him at all times.

51.     Two days later, on Monday, November 29, 2021, the day before the OHS mass shooting, EC was in the classroom of TEACHER # 1, who caught EC looking at ammunition for his gun on the internet in violation of a variety of school, rules, procedures and policies.

52.     Upon information and belief, TEACHER #1 was concerned by this behavior.

53.     Due to TEACHER #1's concerns, TEACHER #1 took EC to the counseling office, where EC was left with Counselor Pam Parker Fine, who was informed of TEACHER #1's observations and concerns about EC's conduct.

54.     Upon information and belief, Parker Fine was given a copy of a photograph taken by TEACHER #1, showing the ammunition for EC's gun. Parker Fine called EC's parents to discuss this concerning behavior, and asked that the parents return her telephone call. Neither of EC's parents returned the call.

55.     Upon information and belief, in addition to the ammunition that EC looked up on his cell phone, other students saw EC on November 29, 2021 with shell casings and live ammunition rounds at OHS.

56.     The ammunition research, coupled with the refusal of the EC's parents to respond to Parker Fine, gave her reasonable cause to suspect child neglect. Hence, Parker Fine was required under Michigan's Child Protection Act, MCL 722.623, *et seq.*, to contact Child Protective Services ("CPS").

57.     The risk posed by EC also required that Parker Fine notify the police, namely the OHS liaison officer, Oakland County Deputy Jason Louwaert, that EC posed a threat to himself and others.

58.     TEACHER #1 and Parker Fine made a knowing and deliberate decision not to report this information to CPS or to local law enforcement (including the OHS liaison officer), and both violated that law by such failure to report.

59.     Defendants Wolf and Throne were both notified of the incident of EC searching for ammunition on his phone.

60.     Defendants TEACHER #1 and Parker Fine deliberately and knowingly sent EC home after school, without any discipline or follow-up regarding his inappropriate search for ammunition during class.

61.     EC was not suspended pending a conference or an investigation; EC was allowed to return to school without any prior meeting or screening; no one searched EC the next day for ammunition or a gun; and no one contacted any police authority. These actions assisted and perpetuated of EC's plans, provided clearance EC to commit a mass school shooting, and increased the risk that Plaintiffs' Minors would be exposed to EC's violent acts.

62.     The night of Monday, November 29, 2021, EC posted on his Twitter account: "Now I am become Death, the destroyer of worlds. See you tomorrow Oxford."

63.     Although EC's Twitter account was set to private, the posting was made to his profile biography, and readily visible to anyone who searched his name, including Defendants.

64.     The very next day, on Tuesday, November 30, 2021, EC returned to OHS and went to the classroom of TEACHER #2, with the handgun and approximately 48 rounds of ammunition in his backpack.

65. The OHS students, including Plaintiffs' Minors, were safer before Defendants TEACHER #1 and Parker Fine knowingly and deliberately allowed the murderous student to return to school the next day, despite the clear and present dangers he posed to students at OHS.

66. At all relevant times, Defendants TEACHER #1 and Parker Fine made a knowing, intentional, and deliberate decision to intentionally withhold and exclude important and vital information from the school liaison officer and by allowing EC to return to school the next day. As a result, all students were placed in immediate danger in light of Defendants' conduct, which accelerated and provided clearance for EC's plans to engage in a mass school shooting.

67. The actions of Defendants TEACHER #1 and Parker Fine amounted to conduct so reckless so as to demonstrate a substantial lack of concern for whether an injury results. Additionally, any person who was informed of EC's behavior by TEACHER #1 and/or Parker Fine similarly engaged in such reckless and deliberately indifferent behavior.

68. On the morning of Tuesday, November 30, 2021, EC was supposed to be doing a Chapter 5 "Test Review" while he was in math class at 8:59 AM. EC instead drew a picture of his 9mm handgun and several other images demonstrating that EC was mentally disturbed and quite dangerous. Immediately underneath the image of the handgun, he wrote, "The thoughts won't stop. Help me." To the right

of that, he drew a person who clearly had two gunshot wounds—one in the chest and one in the abdomen—with blood coming from his mouth. To the right of that, he wrote "blood everywhere," and underneath that there is a hand-drawn bullet. In another area of the same document, EC drew a laughing face with tears, and wrote "My life is useless" and "The world is dead."

69.    These drawings and statements were plainly violent and disturbing, and openly expressed EC's thoughts of despair, violence, and homicidal ideation.

70.    TEACHER #2 became so understandably alarmed in seeing these depictions that he/she took a picture of them on the his/her cell phone and forwarded it to counselor Shawn Hopkins.

71.    Upon information and belief, Defendant TEACHER #2, was also aware of a school policy of excluding backpacks in classroom, and TEACHER #2, made a knowing and deliberate decision to leave EC's backpack unsearched.

72.    Defendant TEACHER #2 knowingly and affirmatively allowed the homicidal student to continue to maintain control of his backpack, phone, and other possessions, giving him easy access to a weapon, and this conduct was more than reckless.

73.    At all relevant times, the students at OHS, and in particular, Plaintiffs' Minors, were safer before Defendant TEACHER #2 knowingly and affirmatively allowed EC to continue to maintain control of his backpack, phone, and other

possessions, giving him easy access to a gun, thereby increasing the risk that Plaintiffs' Minors would be exposed to EC's violent acts.

74.   At all relevant times, the students at OHS, were safer before Defendant TEACHER #2 took action and intentionally did not report the violent notes and drawing by EC to the school liaison officer.

75.   Upon information and belief, that same day, TEACHER #3 saw EC looking up violent videos that depicted a shooting. TEACHERS #2 and #3 reported this to Counselor Shawn Hopkins.

76.   Upon information and belief, at some point, TEACHER #2 took EC to Counselor Shawn Hopkins' office, but left EC's backpack in the classroom, without searching the backpack to ensure that it contained no weapons.

77.   Upon information and belief, Hopkins spoke extensively with EC, who denied that there were any problems. Hopkins then called EC's parents and asked them to come to school for a meeting.

78.   Upon information and belief, TEACHER #2, Hopkins, the Dean of Students Nicholas Ejak, and any other school employees or officials informed of the relevant facts, clearly had enough information to know that EC was mentally distraught, homicidal and potentially or likely armed with bullets and a gun.

79.     All of the Defendants who knew of the relevant facts had a duty and/or an obligation to contact the police or other legal authority and to take steps to keep EC from having any access, let alone unfettered access to OHS and all of its students.

80.     Upon information and belief, EC's backpack contained the Sig Saur 9mm semi-automatic handgun with 48 live bullets. The backpack was with EC or it was brought to him by a school employee to the location where EC was being interviewed by school personnel.

81.     Ejak and Hopkins had just cause to either inspect the contents of the backpack or to withhold the backpack from EC until proper authority could be provided to them to inspect the backpack themselves or to have law enforcement do so.

82.     Not inspecting EC's backpack and allowing him to keep it, with the gun and ammo in it, was an essential factor in allowing EC to carry out his pre-planned school shooting.

83.     Defendants Hopkins and/or Ejak, and/or the other Defendants who had learned of the relevant facts as described above, knew that EC was mentally unstable, distraught, and likely to attempt some sort of attack using a handgun and bullets. Indeed, he drew it for them to see.

84.     Hopkins, Ejak, and the other Defendants who knew the relevant facts, knew that EC needed immediate psychiatric intervention and should not be allowed access to the school and its students until the same could be obtained.

85.     Shockingly, Hopkins, Ejak and the other Defendants who knew the relevant facts allowed EC to remain in school that day.

86.     Upon information and belief, Hopkins and/or Ejak decided that, if EC did not obtain counseling within 48 hours through his parents' assistance, then the school would contact CPS. But, the action taken by Hopkins and/or Ejak was tantamount to no action at all or to adding fuel to the fire. EC, who was clearly mentally distraught and having homicidal ideations was at a crisis moment.

87.     For the benefit and protection of the OHS students, and for EC's own good, the Defendants needed to act independently to search ECs backpack, remove EC from the school and cause ECs parents or the state to get help for EC.

88.     Defendants Hopkins and Ejak reasonably knew that threatening to call CPS within 48 hours, and threatening to remove EC from his home, without actually taking any action, would create and/or increase the likelihood that EC would act before he lost the opportunity.

89.     In making this demand upon EC's parents, Defendants Hopkins and Ejak evidenced their awareness that, at a minimum, EC was a threat to himself and others, and that failure to address EC's situation urgently was criminally neglect.

90.     After the meeting, EC was permitted to return to his classroom with his backpack containing the Sig Saur 9mm semiautomatic handgun and 48 live bullets.

91.     Defendants Hopkins and Ejak conducted this meeting to the exclusion of the school safety liaison officer.

92.     Upon information and belief, after being allowed to return to his classroom, EC took his backpack to a school bathroom, loaded ammunition into the 9mm handgun, and commenced his mass school shooting.

93.     He first shot a student inside the bathroom, shot at several female OHS students in the hallway outside the bathroom, and then he turned his gun toward John Asciutto and Marko Vackaro, who were walking down the hallway, away from the shooter.

94.     Noticing them, EC shot at both: he struck John Asciutto in the left buttock and missed Mark Vackaro, who saw several bullets strike into the hallway wall.

95.     After being shot, John fell down in the hallway, but then quickly got up and made it out the first set of doors to the outside where he ran away as fast as he could.

96.     Marko ran the opposite way of John as fast as he could until he could exit a different set of doors.

97.   Once outside, standing in the snow wondering what was happening, John noticed blood in the snow and then realized it was his blood from having been shot through from his left buttocks out the front of his pelvis.

98.   John and Marko saw each other outside, after which they went to Marko's car.

99.   Marko Vackaro then drove John Asciutto to Crittendon Hospital in Rochester where John's gunshot wound was treated.

100.   Anthony Asciutto II was in an art room when he heard an announcement over the classroom speaker that there was an active shooter at Oxford High School.

101.   Anthony's brother John called him, told him he had been shot and asked if he was okay and Anthony responded that he was.

102.   The art teacher locked the doors into the art room and then Anthony and approximately 25 other high school students and the art teacher all tightly crowded into the windowless "glaze room" to hide from the shooter for approximately one hour until the police arrived and took them out. During that time, they heard someone using the handles on the art room door, trying to enter.

103.   On December 1, 2021, EC was arraigned and charged as an adult with one count of terrorism causing death, four counts of first-degree murder, seven

counts of assault with intent to murder, and twelve counts of possession of a firearm in the commission of a felony.

104.   By reason of the knowledge that the individual government possessed before the shootings began on November 30, 2021, it was foreseeable by said Defendants that EC would carry out violent acts on the Plaintiffs' Minors and others.

105.   The individual government defendants' affirmative actions and conduct was reckless and put the Plaintiff's Minors and others at substantial risk of serious and immediate harm.

106.   The individual government defendants knew or clearly had to know that their actions would endanger the Plaintiffs' Minors herein and other students and persons at Oxford High School.

## COUNT I – STATE-CREATED DANGER, 42 U.S.C. §§ 1983, 1988 INDIVIDUAL GOVERNMENT DEFENDANTS

107.   Plaintiffs repeat each of the preceding Paragraphs' allegations as if they were fully set forth herein.

108.   Plaintiffs' Minors, as United States citizens and pursuant to the 14th Amendment to the United States Constitution, had a clearly established right to be free from danger created and/or increased by the individual government Defendants, *i.e.*, Superintendent Timothy Throne, Principal Steven Wolf, Dean of Students Nicholas Ejak, Counselor Pam Parker Fine, Counselor Shawn Hopkins, TEACHER #1, TEACHER #2, and TEACHER #3.

109.   At all relevant times, the individual government Defendants were acting under color of state law and by way of their actions and conduct created and/or increased a state-created danger by substantially increasing the risk of harm to Plaintiffs' Minors in reckless disregard to their safety with regard to the risk that they would be exposed to private acts of violence.

110.   These actions and conduct of the individual government Defendants were objectively unreasonable and performed knowingly and with deliberate indifference to thereby creating and/or increasing a state-created danger by substantially increasing the risk of harm to Plaintiffs' Minors in reckless disregard to their safety with regard to the risk that they would be exposed to private acts of violence.

111.   These actions and conduct of the individual government Defendants deprived the Plaintiffs' Minors of their clearly established rights, privileges, and immunities in violation of the Fourteenth Amendment of the United States Constitution.

112.   These actions and conduct of the individual government Defendants, which created and/or increased the risk of harm to Plaintiffs' Minors in reckless disregard to their safety with regard to the risk that they would be exposed to private acts of violence, non-exhaustively include:

      a.   Deliberately and intentionally returning EC to class with a loaded Sig Saur 9mm semi-automatic handgun;

22

b.  Deliberately deciding against involving and advising the proper police and other legal authorities of EC's conduct and making a decision to handle the situation without proper authorities being involved;

c.  Choosing to return EC to class with a Sig Saur 9mm semi-automatic handgun after he had been actively searching for ammunition during class on the internet the day before;

d.  Deliberately deciding against searching EC's backpack;

e.  Deciding against reporting EC's internet search for ammunition to proper police and other legal authorities the day before the shooting;

f.  Deliberately returning EC to his classroom with a Sig Saur 9mm semi-automatic handgun and ammunition, after confiscating a picture drawn by EC which demonstrated a high likelihood that he would effectuate a mass school shooting;

g.  Deciding to internally handle the complaints and threat of a school shooter in the days leading to the November 30, 2021 school shooting, rather than involve the proper police and/or other legal authorities;

h.  Deciding against inspecting EC's backpack, which contained the Sig Saur 9mm semi-automatic handgun and ammunition used to shoot Plaintiffs' Minors, and/or EC's locker, when Defendants maintained custody and control over same;

i.  Deliberately and intentionally concealing facts from the appropriate law enforcement and other legal authorities before returning EC to class where he had access to the Sig Saur 9mm semi-automatic handgun used to shoot, shoot at, and terrorize Plaintiffs' Minors;

j.  Deliberately deciding against reporting EC's suspicious behavior to CPS;

k.  Deliberately deciding against reporting Ethan Crumbley's suspicious behavior to appropriate law enforcement;

l.  Interviewing EC in front of his parents, knowing that that interview would accelerate any planned violence, and creating a more dangerous situation for the students after said interview by, inter alia, providing clearance and the go ahead for EC to thereafter commit his violent acts;

m.  Deliberately deciding against having appropriate mental health intervention for EC prior to returning him to class with a Sig Saur 9mm semi-automatic handgun and ammunition;

n.  Demonstrating conduct so reckless that it demonstrates a substantial lack of concern for whether any injury would result;

o.  Wrongfully causing Plaintiffs' Minors to suffer extreme emotional distress;

p.  Recklessly, or otherwise improperly returning EC to class with the Sig Saur 9mm semi-automatic handgun, so that he could effectuate his murderous ideology;

q.  Enforced the deficient and faulty policies, procedures, and practices set forth in Count III, *infra*, as well as those previously described herein.

r.  The failures and resulting failures of the actions set forth in the foregoing subparagraphs; and

s.  Any and all other breaches that may become known throughout the course of this litigation.

113.  The foregoing non-exhaustively described actions and conduct of the individual government Defendants was a proximate cause of the Plaintiffs' Minors' injuries and damages.

114.  As to Plaintiff's Minor, John Asciutto, those injuries and damages non-exhaustively include:

a.  Gunshot wound to his left buttocks that exited out the front of his pelvis;

b.  Conscious pain and suffering;

c.  Need for wound care;

d.  Need for therapy and counseling;

    e.  Scarring;

    f.  Fright, shock and terror;

    g.  Mental, psychological and emotional distress, anxiety and anguish;

    h.  Post-Traumatic Stress Disorder;

    i.  Medical, hospital and therapy/counseling expenses;

    j.  Punitive damages;

    k.  Exemplary damages;

    l.  Any and all other available past and future compensatory damages;

    m.  Attorneys' fees and costs, 42 U.S.C. § 1988;

    n.  Any other injuries and damages relating to the aforedescribed incident that is revealed in the course of discovery;

    o.  Any other damages allowed by law.

115.   As to Plaintiff's Minor, Anthony Asciutto II, those injuries and damages non-exhaustively include:

    a.  Need for therapy and counseling;

    b.  Fright, shock and terror;

    c.  Mental, psychological and emotional distress, anxiety and anguish;

    d.  Post-Traumatic Stress Disorder;

    e.  Medical, hospital and therapy/counseling expenses;

    f.  Punitive damages;

    g.  Exemplary damages;

h. Any and all other available past and future compensatory damages;

i. Attorneys' fees and costs, 42 U.S.C. § 1988;

j. Any other injuries and damages relating to the aforedescribed incident that is revealed in the course of discovery;

k. Any other damages allowed by law.

116. As to Plaintiff's Minor, Marco Vackaro, those injuries and damages non-exhaustively include:

a. Need for therapy and counseling;

b. Fright, shock and terror;

c. Mental, psychological and emotional distress, anxiety and anguish;

d. Post-Traumatic Stress Disorder;

e. Medical, hospital and therapy/counseling expenses;

f. Punitive damages;

g. Exemplary damages;

h. Any and all other available past and future compensatory damages;

i. Attorneys' fees and costs, 42 U.S.C. § 1988;

j. Any other injuries and damages relating to the aforedescribed incident that is revealed in the course of discovery;

k. Any other damages allowed by law.

117. The individual government Defendants are not entitled to governmental or qualified immunity for their aforedescribed actions and conduct.

26

WHEREFORE, Plaintiffs claim judgment against the individual government Defendants in an amount to which they are found to be entitled, together with interest, costs, attorneys' fees, exemplary damages and punitive damages.

### COUNT II - 42 U.S.C. §§ 1983, 1988 - SUPERVISORY LIABILITY DEFENDANTS SUPERINTENDENT TIMOTHY THRONE AND PRINCIPAL STEVEN WOLF

118.   Plaintiffs repeat each of the preceding Paragraphs' allegations as if they were fully set forth herein.

119.   At all relevant times, Defendant Throne was the Superintendent at Oxford Community School District, and directly supervised and oversaw the actions of Defendants Wolf, Counselor Pam Parker Fine; Counselor Shawn Hopkins, TEACHER #1, TEACHER #2, TEACHER #3, and Ejak, and encouraged the specific incident of misconduct and/or directly participated in it by not expelling, disciplining, and providing proper supervision for EC, and/or notifying police and/or other legal authorities of ED's violent plans.

120.   At all relevant times, Defendant Throne, was the Superintendent at Oxford Community School District, and directly supervised and oversaw the actions of Defendants Wolf, Counselor Pam Parker Fine; Counselor Shawn Hopkins, TEACHER #1, TEACHER #2, TEACHER #3, and Ejak, and encouraged the specific incident of misconduct and/or directly participated in it by discouraging and dismissing the reporting, sharing, or mentioning of threats against OHS.

121.   At all relevant times, Defendant Wolf was the principal at OHS. He was the direct supervisor and oversaw the actions of Defendants Counselor Pam Parker Fine; Counselor Shawn Hopkins, TEACHER #1, TEACHER #2, TEACHER #3, and Ejak, and encouraged the specific incident of misconduct and/or directly participated in it by not expelling, disciplining, and providing proper supervision for EC.

122.   By inadequately training and/or supervising their teachers, counselors, and dean of students, and having a custom or policy of indifference to the constitutional rights of their citizens, and/or by failing to adequately supervise school shooter, EC, Defendants Throne and Wolf encouraged and cultivated the conduct which then caused a violation of Plaintiffs' Minors' rights under the Fourteenth Amendments of the United States Constitution.

123. By not expelling, disciplining, searching, or providing proper supervision for EC, Defendants Throne and Wolf authorized, approved, or knowingly acquiesced in the unconstitutional conduct of Defendants Counselor Pam Parker Fine; Counselor Shawn Hopkins, TEACHER #1, TEACHER #2, TEACHER #3, and Ejak, by allowing EC to return to his classroom and carry out his mass school shooting.

124. Pursuant to the Fourteenth Amendment of the United States Constitution, at all relevant times, each of Plaintiffs' Minors had a clearly established right to be free from dangers created by the Defendants.

125. That actions and omissions by Defendants Throne, Wolf, Counselor Pam Parker Fine; Counselor Shawn Hopkins, TEACHER #1, TEACHER #2, TEACHER #3, and Ejak, under the Fourteenth Amendment to the United States Constitution, as well as 42 U.S.C. §§ 1983 and 1988 were all performed under the color of state law and were objectively unreasonable and performed knowingly and with deliberate indifference to Plaintiffs' Minors and in reckless disregard to their safety.

126. These actions and conduct of the individual government Defendants, which created and/or increased the risk of harm to Plaintiffs' Minors in reckless disregard to their safety with regard to the risk that they would be exposed to private acts of violence, non-exhaustively include the actions/conduct already set forth in subparagraphs (a)-(s) of ¶ 112, *supra*.

127. The foregoing non-exhaustively described actions and conduct of the individual government defendants was a proximate cause of the Plaintiffs' Minors' injuries and damages.

128.   As to Plaintiff's Minor, John Asciutto, those injuries and damages non-exhaustively include the injuries/damages already set forth in subparagraphs (a)-(o) of ¶ 114, *supra*.

129.   As to Plaintiff's Minor, Anthony Asciutto II, those injuries and damages non-exhaustively include the injuries/damages already set forth in subparagraphs (a)-(k) of ¶ 115, *supra*.

130.   As to Plaintiff's Minor, Marco Vackaro, those injuries and damages non-exhaustively include the injuries/damages already set forth in subparagraphs (a)-(k) of ¶ 116, *supra*.

131.   Defendants Thone and Wolf are not entitled to governmental or qualified immunity for their aforedescribed actions and conduct.

WHEREFORE, Plaintiffs claim judgment against the Defendants Thone and Wolf in an amount to which they are found to be entitled, together with interest, costs, attorneys' fees, exemplary damages and punitive damages.

### COUNT III – 42 U.S.C. §§ 1983, 1988 – *MONELL* LIABILITY DEFENDANT OXFORD COMMUNITY SCHOOL DISTRICT

132.   Plaintiffs repeat each of the preceding Paragraphs' allegations as if they were fully set forth herein.

133.   At all relevant times, Defendant Oxford Community School District failed and failed adequately to train, discipline and supervise the individual government Defendants, *i.e.*, Throne, Wolf, Counselor Pam Parker Fine; Counselor

30

Shawn Hopkins, TEACHER #1, TEACHER #2, TEACHER #3, and Ejak, promulgating and maintaining *de facto* unconstitutional customs, policies, or practices, rendering them liable for the constitutional violations alleged herein under *Monell v. Dept. of Social Services of the City of New York,* 436 U.S. 658 (1978).

134.   At all relevant times, Defendant Oxford Community School District knew or should have known that the policies, procedures, training supervision and discipline of the individual government Defendants were inadequate for the tasks that each of those individual government Defendants was required to perform.

135.   At all relevant times, Defendant Oxford Community School District failed to establish, implement, or execute adequate policies, procedures, rules and regulations to ensure that their actions did not create or increase the risk that Plaintiffs' Minors would be exposed to private acts of violence.

136.   At all relevant times, Defendant Oxford Community School District failed to establish, implement, or execute adequate policies, procedures, rules and regulations to ensure that their teachers, counselors and staff do not take actions that create or increase the risk of harm to district's students at OHS, such as Plaintiffs' Minors.

137.   At all relevant times, Defendant Oxford Community School District was on notice or should have known of a history, custom, propensity, and pattern for the individual government Defendants and other employees of OHS, to fail to

properly identify a student with violent tendencies and acted in such a way that created a risk of harm to OHS students and/or increased a risk of harm to OHS students, such as Plaintiffs' Minors.

138.   Defendant Oxford Community School District explicitly and implicitly authorized, approved, or knowingly acquiesced in the deliberate indifference to the strong likelihood that constitutional violations, such as in the instant case, would occur, and pursued policies, practices, and customs that were a direct and proximate cause of the deprivations of Plaintiffs' Minors' constitutional rights.

139.   At all relevant times, Defendant Oxford Community School District knew that its policies, procedures, customs, propensity and patterns of supervising a student with violent tendencies and murderous ideology, would deprive citizens, such as Plaintiffs' Minors, of their constitutional rights.

140.   At all relevant times, Defendant Oxford Community School District knew that its policies, procedures, customs, propensity and patterns allowed administrators, counselors, teachers and/or staff to return a student with violent tendencies back to his classroom such that their actions created a risk of harm and/or an increased risk of harm to the students at OHS before getting permission from proper authorities.

141.   Upon information and belief, Defendant Oxford Community School District maintained a policy that allowed administrators, counselors, teachers and/or

staff to return a fully weaponized violent child with murderous plans, back into a classroom, such that he could effectuate a mass school shooting.

142.   Reflexively, Defendant Oxford Community School District failed to maintain a policy directing administrators, counselors, teachers and/or staff to immediately remove or promptly effectuate the removal of someone who has reasonably communicated a threat to others by way of a firearm or other deadly weapon from school grounds.

143.   By inadequately training and/or supervising their principals and counselors and having a custom or policy of deliberate indifference to the constitutional rights of their citizens, Defendant Oxford Community School District encouraged and cultivated the conduct which violated Plaintiffs' Minors' rights under the Fourteenth Amendment of the United States Constitution, and provided clearance for EC to commit his violent acts, thereby increasing the risk that Plaintiffs' Minors would be exposed to EC's violent acts.

144.   The foregoing non-exhaustively described actions and conduct of Defendant Oxford Community School District was a proximate cause of the Plaintiffs' Minors' injuries and damages.

145.   As to Plaintiff's Minor, John Asciutto, those injuries and damages non-exhaustively include the injuries/damages already set forth in subparagraphs (a)-(o) of ¶ 114, *supra*.

146.   As to Plaintiff's Minor, Anthony Asciutto II, those injuries and damages non-exhaustively include the injuries/damages already set forth in subparagraphs (a)-(k) of ¶ 115, *supra*.

147.   As to Plaintiff's Minor, Marco Vackaro, those injuries and damages non-exhaustively include the injuries/damages already set forth in subparagraphs (a)-(k) of ¶ 116, *supra*.

148.   Defendant Oxford Community School District is not entitled to governmental or qualified immunity for their aforedescribed actions and conduct.

WHEREFORE, Plaintiffs claim judgment against Defendant Oxford Community School District in an amount to which they are found to be entitled, together with interest, costs, attorneys' fees, exemplary damages and punitive damages.

### COUNT IV – CHILD PROTECTION LAW, MCL 722.621 *ET SEQ.* INDIVIDUAL GOVERNMENT DEFENDANTS

149.   Plaintiffs repeat each of the preceding Paragraphs' allegations as if they were fully set forth herein.

150.   Michigan's Child Protection Act, MCL 722.621 *et seq.*, places upon certain persons the obligation to report abuse and neglect that the persons reasonably suspect may be occurring.

151.   Each and every one of the individual government Defendants was a required reporter within the definitions set forth in the statute.

152.   Each and every one of the individual government Defendants had information sufficient to give them reasonable cause to suspect that EC was being abused and/or neglected by his parents.

153.   Defendants Hopkins and Ejak, on November 30, 2021, before EC was allowed to walk out of the meeting with them and his parents and begin his shooting spree, knew that EC had severe mental disturbance that his parents were refusing to address.

154.   As alleged in the common allegations, Defendants Hopkins and Ejak knew that the situation was so serious that they threatened to contact CPS themselves if help was not obtained for EC within 48 hours.

155.   By virtue of the fact that EC's parents refused to take EC out of school that day despite the specific demand on the part of Defendants Hopkins and Ejak that they do so, Defendants Hopkins and Ejak had ample reason to suspect that action would not be taken by the parents to obtain immediate treatment for their son.

156.   The statements made on the note and drawing found by TEACHER #2 on November 30, photographed by him/her, and made available to Defendants Hopkins and Ejak were sufficient to indicate an unreasonable risk that EC would harm himself and/or others.

157.   The individual government Defendants were presented with evidence that EC had attempted to purchase ammunition online on November 29, 2021; and

had drawn images of guns and bleeding bodies, annotated with desperate statements about his mental state.

158.   These individual government Defendants had specific experience with suicides among students at OHS in the preceding five years, in that there had been at least two students who had taken their own lives among the OHS student body. This experience heightened their awareness of the risk that EC would take his own life and/or the lives of others.

159.   All of this information was sufficient, especially when coupled with EC's parents' indifference and lack of willingness to address the matter immediately, to cause the individual government Defendants to suspect that EC was being neglected and that the immediate and subsequent reporting requirements set forth in the Child Protection Law needed to be complied with.

160.   MCL 722.633 provides that a mandatory reporter who fails to report suspected abuse or neglect is "civilly liable for the damages proximately caused by the failure."

161.   The failure to report by the individual government Defendants was a proximate cause of the injuries and damages suffered by the Plaintiffs' Minors herein as non-exhaustively described in ¶¶ 114-116, *supa*.

162.   Governmental immunity for individual governmental actors pursuant to MCL 691.1407(2) does not apply to this claim because it is statutorily created and does not sound in tort.

WHEREFORE, Plaintiffs claim judgment against the individual government Defendants in an amount to which they are found to be entitled, together with interest, costs, attorneys' fees, exemplary damages and punitive damages.

Respectfully submitted,

**Giroux Trial Attorneys, P.C.**

Dated: February 24, 2022

/s/ Robert M. Giroux
ROBERT M. GIROUX (P47966)
Attorneys for Plaintiffs
28588 Northwestern Hwy., Ste. 100
Southfield, MI 48034
(248) 531-8665
rgiroux@greatMIattorneys.com

## JURY DEMAND

Plaintiffs NICOLETTE ASCIUTTO, as Next Friend for JOHN ASCIUTTO and ANTHONY ASCIUTTO II, minors; and JOHN VACKARO as Next Friend for MARCO VACKARO, a minor, by and through their attorneys, Giroux Trial Attorneys, P.C., hereby demands Trial by Jury in this matter on all issues so triable.

Respectfully submitted,

***Giroux Trial Attorneys, P.C.***

Dated: February 24, 2022

/s/ Robert M. Giroux
ROBERT M. GIROUX (P47966)
Attorneys for Plaintiffs
28588 Northwestern Hwy., Ste. 100
Southfield, MI 48034
(248) 531-8665
rgiroux@greatMIattorneys.com

38